SHIELDS *v.* EQUITABLE LIFE ASSURANCE SOCIETY.

LIFE INSURANCE—AGENT'S CONDITIONAL RECEIPT—UNAUTHORIZED
CANCELLATION OF POLICY.

An insurance policy in the ordinary form was issued and de-
livered to the insured, who held at the time the soliciting
agent's receipt stating that his note, given for the first pre-
mium, should be returned to him in case the agent was unable
to get back from the state agent certain other notes, then in
suit, given for the premium on a former policy. Shortly before
the note matured, insured wrote the soliciting agent, who
had discounted the note and made payment to the company,
inclosing the policy, and asking the return of his note, on the
ground that the condition had not been fulfilled. The agent
persuaded insured to let the matter rest for the time being,
and did nothing further until, insured having fallen sick with
what proved to be a fatal illness, during which sickness he
was mentally unable to transact business, he then surrendered
the policy for cancellation. *Held,* that the beneficiary had a
right to have the policy re-established, as cancellation without
authority from the insured was ineffectual; there being noth-
ing to show that it was contemplated that the insurance
should not attach until the earlier notes were returned to the
insured or the later note was paid by him.

Appeal from Ingham; Person, J. Submitted October
6, 1899. Decided November 14, 1899.

Bill by Nellie E. Shields against the Equitable Life
Assurance Society of the United States, impleaded with
John C. Day and others, to re-establish a policy of insur-
ance. From a decree for complainant, defendant appeals.
Affirmed.

*R. A. Montgomery,* for complainant.

*Dickinson, Warren & Warren,* for defendant.

MOORE, J. The statement of facts is taken in the main
from the brief of the solicitor for complainant. In the

spring of 1890, John C. Shields, the husband of complainant, applied for and took from the defendant insurance company a policy of insurance,—No. 464,145,—(not the policy in suit), through the agent of the company, John Heffron, of Detroit, the insured giving his notes for the premium.   Thereafter Mr. Shields learned that his age had been incorrectly stated in the application, conceived his policy void, and sought to have the transaction re-scinded.   A controversy arose, and suit was brought on his notes.   After the suit was brought, and while it was pending, in December, 1891, Mr. Shields, while on the train coming from Alpena, met Dr. M. F. Newkirk, of Bay City, who was at that time writing insurance for defendant insurance company.   Thereafter Mr. Shields went to Dr. Newkirk's office, and the subject of life insurance was talked over.   Mr. Shields told Dr. Newkirk of his trouble in relation to the policy issued by Mr. Heffron, and finally an agreement was reached, and Mr. Shields made his application for the policy in controversy on December 14, 1891,—a policy of $5,000, payable to his wife, the complainant.   He gave to Dr. Newkirk his note for $217.50 for the first year's premium, payable in 90 days.   He took from Dr. Newkirk an agreement as follows:

"Received from John C. Shields his notes for $217.50, premium on policy applied for in Equitable Life Ins. Co. Said notes are to be returned to him unless I succeed in getting notes from John C. Day, formerly given for policy No. 464,145, and now held by said Day, and now in suit by him, without costs to said Shields.

"Bay City, Mich., December 14, 1891.

"M. F. NEWKIRK."

The next day Mr. Newkirk visited Detroit, and attempted to settle the Heffron-Day notes and suit, and failed to do so.   The application made to Dr. Newkirk for the policy in suit was forwarded.   The policy was issued on December 22, 1891.   The note given by Mr. Shields to Dr. Newkirk for the premium was discounted

at the bank. The policy was forwarded to Newkirk, and by him sent to Mr. Shields about the last of December, 1891. Mr. Shields' note matured on March 17, 1892. Shortly before his note became due, he wrote Newkirk, inclosing the policy, and asking the return of his note. After Mr. Shields sent the letter written before the maturity of his note (the letter with which he inclosed his policy,—the one in suit), Dr. Newkirk saw him, and, in the language used by him in a letter giving his version of the matter, "persuaded him to let the matter rest, in hope that I could arrange a certain matter in Detroit, upon which contingency his paying the note seemed to hang." On March 8, 1892, Mr. Shields was taken sick in Lansing. On the 19th he was removed to Fowlerville, Mich., where he died on the 1st day of May following. His illness was serious. He was mentally unable to transact any business from the first. On the 19th day of March, Mr. McNamara, the law partner of Mr. Shields, received a dispatch as follows:

"BAY CITY, March 19, 1892.
"To JAMES McNAMARA, Alpena, Mich.:
"J. C. Shields' note returned unpaid. I have paid company the amount, and, if you do not pay, I lose all. Will make draft 30 days. Answer.
[Signed]        "C. T. NEWKIRK."

To that dispatch Mr. McNamara responded:

"March 19, '92.
"C. T. NEWKIRK, Bay City:
"Shields is lying ill at Downey House, Lansing.
[Signed]        "JAS. McNAMARA."

Thereafter, and on March 24th, McNamara wired Dr. C. T. Newkirk as follows:

"DR. C. T. NEWKIRK, Bay City:
"Was Shields' note for life insurance, and is it paid?
[Signed]        "JAS. McNAMARA."

The answer was:

"BAY CITY, March 24, 1892.
"JAS. McNAMARA, Alpena:
   "Shields' note was for life insurance, and was paid.
                  [Signed]      "Dr. C. T. NEWKIRK."

It is claimed, and it is doubtless true, that Dr. Newkirk meant to be understood that the note was given for life insurance, and that it had been paid by Dr. Newkirk. On March 21st Dr. Newkirk drew his draft on Mr. Shields for $219.27. The draft was received at the Alpena National Bank on the 23d day of March, 1892. Mr. Shields' note accompanied it. They held the draft about 10 days, and it was then returned by the Alpena bank to the Second National Bank of Bay City. On April 12th Dr. Newkirk attached the draft to the note, and sent it to Lansing. The draft was received at the Lansing State Savings Bank on the 12th of April. Mr. Shields was then in Fowlerville, sick; and on April 22, 1892, the draft was returned to the Bay City bank. Four days after Mr. Shields' death, Mr. McNamara telegraphed Mr. Newkirk as follows:

"On 23d March I telegraphed you if J. C. Shields' note for life insurance was paid. You answered on the 24th March it was. I then had money to pay it. If note for $219.27 has not been paid, send to Alpena National Bank, and I will pay it at once. Please answer.
                  [Signed]      "JAS. McNAMARA."

Dr. M. F. Newkirk, May 6th, by letter, answered this dispatch at length, and, among other things, said:

"I presume the policy has been canceled. I have written Mr. Day [who was state manager for Michigan of the company], and as soon as I get a reply I will forward it to you."

On the 9th day of December, 1892, thereafter, M. V. Montgomery, in behalf of the complainant, filed the proofs of death, which had been prepared in the November preceding, and at the same time demanded the return of the policy. The company informed Mr. Montgomery the policy had been destroyed, and denied any liability.

The company claims the policy was canceled before the death of Mr. Shields. The proof upon that point is not very satisfactory. The officers who had personal knowledge of when it was canceled were not sworn. It is somewhat significant that, only eight days before the death of Mr. Shields, the note was in the Lansing bank for collection, and it was retained by Dr. Newkirk until the time this case was tried. The doctor says the retention was an inadvertence. Dr. Newkirk did not himself undertake to cancel the policy, but returned it to the state manager, Mr. Day, in Detroit, who says his attention was called to the policy by a clerk in his office. He says the policy was in his desk for several days, when he took it to New York, and handed it to the auditor, with the usual statement, and a request that it should be canceled. He thinks this was from the 15th to the 20th of April, but says he could not fix the date without examining the register of the hotel where he stopped. The record does not disclose this was done. As will appear later, it perhaps is not material when this policy was destroyed. If its destruction was unauthorized, its provisions would remain in force. The circuit judge held that the policy had been delivered to Mr. Shields with the purpose of giving it effect, and would remain in force until Mr. Shields should exercise his option to have it canceled. He held that it never had been canceled at the request of Mr. Shields. Dr. Newkirk having persuaded Mr. Shields to withdraw his request for cancellation, and this being the condition of affairs when Mr. Shields died, he held that the prayer of the complainant should be granted. From this decree defendant appealed the case to this court.

The solicitors say the court below did not have the advantage of a proper presentation of the case, and erred in his conclusion that the policy was delivered to take immediate effect. Counsel say:

"The contract between the parties was a conditional one. Shields did not stipulate to pay the note and accept the policy in any event, but obligated himself to pay and

take the insurance provided the so-called 'Heffron notes' were delivered to him. The company was not bound until the insured was bound.

"The notes, the receipt, and the policy to be issued evidenced the contract between the parties.

"The note was never paid. The condition upon which the note was executed and delivered, as evidenced by the writing, was never fulfilled; nor was the condition upon which the note was delivered, and upon which its validity depended, ever waived by Shields."

They insist the contract was a conditional one, and no liability ever grew out of it.

"The parties in fact agreed that the policy should not be binding upon the company unless the premium note was paid at maturity, or the Heffron notes returned to Shields before the maturity of the new note, and the note thus become a valid and unconditional obligation of the applicant."

They cite *Baker* v. *Insurance Co.*, 43 N. Y. 286; *American Ins. Co.* v. *Stoy*, 41 Mich. 385; *Faunce* v. *Assurance Co.*, 101 Mass. 279; *Benton* v. *Martin*, 52 N. Y. 570; *Ware* v. *Allen*, 128 U. S. 595; *Harnickell* v. *Insurance Co.*, 111 N. Y. 390 (2 L. R. A. 150),—relying especially upon the last-named case.

We do not think the contention of the solicitors as to the effect of the contract between the insurance company and Mr. Shields is tenable. The authorities cited by counsel held that, in the respective cases decided, the contract made was a conditional one, and, the conditions not having been met, the liability did not attach. As we interpret this record, so far as the contract between the insurance company and Mr. Shields was concerned, it was not a conditional one. Mr. Shields made his application, in which he agreed to pay a certain premium. The company accepted his application, and recited in the policy that it had received the premium, and the policy was delivered to Mr. Shields. The testimony of the agent and of the state manager is that no credit was extended by the company to Mr. Shields, but the premium was in fact paid to the

company by the state manager, who in turn was paid by Mr. Newkirk; the latter of whom had discounted the note at the bank before maturity, and obtained the money upon it. This made a complete contract, and it is too late now, after Mr. Shields is dead, to say the contract was a conditional one. 1 Joyce, Ins. § 86, and the many cases there cited. The record does not disclose that the company had any knowledge whatever of the arrangement made between Dr. Newkirk and Mr. Shields. There is nothing in the receipt given by Dr. Newkirk indicating the policy should not attach while Mr. Newkirk was trying to get the notes from Mr. Day. Nor is there anything to indicate the policy should not be in force until the note of Mr. Shields was paid. The record discloses very clearly this was not the belief or intention of either Dr. Newkirk or Mr. Shields, and we do not think it was the effect of the agreement. Mr. Shields could not have interposed this defense to an action upon the note if it had been sued by the bank; and though, perhaps, it would have been a defense had he been sued by Dr. Newkirk, it was a defense he could waive. There is no statement in the receipt as to when the Day notes were to be returned. Mr. Shields, because the notes were not returned, asked to have the policy canceled, but he was persuaded not to insist upon it, and he yielded to the persuasion. The record is very clear that after this he never requested the policy should be canceled, and he was never advised by the agent that he intended to have the policy canceled. See *Dove* v. *Insurance Co.*, 98 Mich. 122. The agent, who had caused the premium to be paid to the company, insisted until long after Mr. Shields' fatal illness began, and until a few days of his death, upon the payment of the note, which had been given to him, and which had never belonged to, or been in the possession of, the company.

The decree is affirmed, with costs.

The other Justices concurred.